IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Christeen H. Martin,<br>    Plaintiff,<br><br>v.<br><br>Greenville Hospital System,<br>    Defendant. | Case No 6:11-cv-02911-GRA-JDA<br><br>**REPORT AND RECOMMENDATION**<br>**OF MAGISTRATE JUDGE** |

This matter is before the Court on a motion for summary judgment filed by Defendant. [Doc. 19.] This action alleges a claim for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"),[1] and 42 U.S.C. § 1981. [Doc. 1-1 ¶ 1.] Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

Defendant removed this action from state court on October 26, 2011 [Doc. 1] and filed an answer on October 28, 2011 [Doc. 7]. Defendant filed its motion for summary judgment on July 20, 2012. [Doc. 19.] Plaintiff filed a response in opposition on August 27, 2012 [Doc. 21], and Defendant filed a reply on August 31, 2012 [Doc. 24]. Accordingly, Defendant's motion is now ripe for review.

## BACKGROUND

Plaintiff began employment with Defendant on July 16, 2007 as a central sterile processing technician at Defendant's Patewood facility. [Doc. 19-2 at 6.] Plaintiff worked in the Central Sterile Processing Department ("CSP") and performed duties including

---

[1] It is undisputed that Plaintiff timely filed an EEOC charge, received her right to sue letter, and filed this action within the "right to sue" period. [Doc. 1-1 ¶ 11; Doc. 7 ¶11.]

cleaning, decontaminating, sterilizing, repackaging, and preparing of equipment and tools to be used in surgery. [*Id.* at 12, 15.] She held this job position for her entire employment with Defendant, although she became a certified surgical technician in 2009 and received a pay raise as a result. [*Id.* at 8–9, 29.]

Plaintiff had been hired by and reported to Geoff Hibbert ("Hibbert"), Perioperative Manager at Patewood. [*Id.* at 6–7, 9.] When Hibbert left GHS in 2009, Plaintiff reported to Hibbert's replacement, Cynthia Cash ("Cash"), Perioperative Services Nurse Manager at Patewood. [Doc. 19-4 ¶ 1.]

Plaintiff received performance evaluations every year. Her first evaluation occurred in September 2008 and was conducted by Hibbert. [Doc. 19-3 at 4–12.] Plaintiff received the lowest possible rating in the categories of "consistently shows a positive attitude towards patients and family, coworkers, physicians and supervisors" and "positive communications." [*Id.* at 5, 8.][2] Plaintiff signed the evaluation, indicating that she "read the review and had the opportunity to discuss it with management." [*Id.* at 4.]

Plaintiff's second evaluation occurred in September 2009. [Doc. 19-3 at 14–22.] Sandra Turner ("Turner") conducted this evaluation because Cash had not worked with Plaintiff for very long. [Doc. 19-2 at 31–32.] In this evaluation, Turner made many favorable comments about Plaintiff's skill in her technical job duties. [Doc. 19-3 at 22.] With regard to teamwork and communication, Turner made the following comments: "I feel

---

[2]The evaluation contained several specific references to communication problems and problems getting along with fellow employees. [Doc. 19-3 at 5, 8, 12.] For example, complaints had been received "from Scrub Techs that [Plaintiff] always complains to them and . . . they don't like to help in Central Sterile because of the tension" Plaintiff causes. [*Id.* at 5.] In addition, Hibbert noted that Plaintiff needed to work on her communication with her lead technician and supervisor. [*Id.*] The evaluation indicated Plaintiff had good technical skills and took pride in her work, but she needed to improve the way she spoke to and treated her co-employees. [*Id.* at 12.]

2

she has great potential and is very much aware of her areas in need of improvement, such as relationship with immediate co-worker," and "[s]he is striving to improve her relationship with all co-workers." [*Id*.] In addition to the evaluation, Turner would sometimes have conversations with Plaintiff about her need to improve her relations with co-workers. [Doc. 19-2 at 33, 36; Doc. 19-5 ¶ 5.][3]

In February 2010, Cash conducted a staff survey to get a sense of how employees were getting along in the department. [Doc. 19-4 ¶ 7.] During her survey meeting with Cash, Plaintiff acknowledged that one of her weaknesses was controlling her temper. [Doc. 19-3 at 24.] Comments from other employees surveyed included the following: from an African-American technician, "CSP is terrible" and "Christeen–mean" [*id.* at 25]; from another African American technician, "CSP– fight too much (no teamwork)" [*id.* at 27]; from a white employee, "Christine ignores everybody, just does what she wants; poor communication." [*id.* at 28].

Cash issued a written warning to Plaintiff on March 10, 2010 due to "ineffective teamwork within the department," "[c]onstant complaints from co-workers about poor attitude," and "[c]omplaints of unwillingness to teach new employees." [*Id.* at 31–32.] Cash had received specific complaints from employees Susan Jones and Barb Acker concerning

---

[3]According to Turner, GHS utilizes a specific program to assist in management of their employees:

> GHS follows the Studer Management Philosophy which emphasizes every employee's role to create a positive work environment and work well with their co-employees. Its focus is on company culture, which ultimately impacts the quality of care and the patient experience. The entire leadership team at GHS has been challenged to focus on poor performers, behavioral problems and those negatively impacting employee culture and morale. In 2010, Cynthia Cash and I met with all employees in the Perioperative Department to reinforce the Studer Management Philosophy.

[Doc. 19-5 ¶ 2.]

Plaintiff's poor attitude and ineffective teamwork.[4] [*Id.* at 59 ¶ 3; *see also* Doc. 19-4 ¶ 3 (averring Cash received complaints from several employees regarding Plaintiff's attitude and unwillingness to be a team player).] The warning stated that further incidents would result in suspension. [Doc. 19-3 at 31.] Plaintiff believed the warning was unfair, in part because the new employee she was supposed to help was always on the phone: "Like I explained to Cynthia, how can I help her if she's on the phone?" [Doc 19-2 at 38.] Plaintiff did not tell Cash that she believed the warning was based on Plaintiff's race. [*Id.* at 19–20, 39.]

Naz Hudani ("Hudani") was hired as a technician in CSP in the spring of 2010. [*Id.* at 37–39.] Plaintiff began training Hudani. [*Id.* at 37.] Plaintiff learned from Hudani that Cash and Turner were asking Hudani about Plaintiff's treatment of her:

> Naz would come in several days and say, ask me why are they askin' me are you bein' mean? I'm like, I don't know. She would tell me Cynthia would ask her, is she bein' mean or is she bein' helpful? She'd say Sandy would ask her was I bein' mean or was I bein' helpful?

[*Id.* at 37–38.] Plaintiff believed Cash and Turner were trying to influence Hudani's perception of Plaintiff. [*Id.* at 55.]

Following the written warning, Cash and Turner continued to receive complaints from Plaintiff's co-workers, including verbal and written complaints from Hudani. In a written complaint dated June 14, 2010, Hudani stated that Plaintiff did not talk to her: "When I say good morning, she does not answer. She stated it is not her problem that I

---

[4]Cash and Turner had also heard from Richard Reed, Manager of CSP for all of Greenville Hospital System, that employees at Greenville Memorial Hospital did not want to fill in to work at Patewood because of Plaintiff. [Doc. 19-4 ¶ 3; Doc. 19-5 ¶ 3.]

4

can not hear when she replies, and it is not in the policy that she has to talk to me unless it is work related." [Doc. 19-3 at 34.] On August 3, 2010, employee Reba Biggs ("Biggs") and Hudani asked to meet with Turner about Plaintiff's rudeness earlier that day. [*Id.* at 36; Doc. 19-5 ¶ 9.] Plaintiff attended the meeting and stated that "she was tired of hearing that she was difficult to get along with." [Doc. 19-3 at 36.] She also stated that "sometimes she may come in and not speak 2 words but that she was just sometimes in that mood." [*Id.*] Later that month, Turner and Cash received complaints from Biggs and Hudani that Plaintiff had threatened them and told them that she would make their lives "a living hell." [*Id.* at 2, 38.] It appeared to Cash and Turner that Plaintiff continued to be unable to get along with co-employees, and her behavior and attitude were detrimental to the department. [Doc. 19-4 ¶ 10; Doc. 19-5 ¶ 5.]

On August 23, 2010, Plaintiff received a three-day suspension due to "consistent complaints from co-workers related to negative attitude and threatening work environment." [Doc. 19-3 at 40; Doc. 19-2 at 42.] Cash informed Plaintiff that if she did not improve, the consequence would be termination. [Doc. 19-2 at 43; Doc. 19-3 at 40; Doc. 19-4 ¶ 10.] Cash told Plaintiff to follow up with Defendant's Employee Assistance Program ("EAP") and to attend the next available Lateral Violence Class. [Doc. 19-2 at 42; Doc. 19-3 at 40–41.] Plaintiff did attend an EAP appointment [Doc. 19-2 at 49] but testified that the violence class was never available and she so informed Cash or Turner. [Doc. 19-2 at 42–43.]

Plaintiff filed an employee grievance regarding her suspension. [Doc. 19-3 at 43.] She alleged that the discipline was not supported by facts but was "based on rumors and/or he said/she said statements" about Plaintiff that may have been "solicited by [her] supervisors." [*Id.*] She did not allege that her suspension was the result of race

5

discrimination, but she did allege the discipline, the request to take the lateral violence class, and the threat of termination created a hostile work environment. [*Id.*] Her grievance was reviewed by Cash; Beverly Haines ("Haines"), Director of Patient Care Services; and Scott Jones ("Jones"), President of Patewood. [*Id.* at 59–60, 62, 64.] In her response to the grievance, Cash explained that no complaints were solicited by supervisors; rather, co-workers freely came to Cash or Turner with verbal complaints. [*Id.* at 59 ¶ 6.] "After continuing to hear [complaints]," Cash asked the complainants to document their concerns. [*Id.*] Haines met with Plaintiff concerning her grievance and, as Plaintiff had requested, also spoke with several other CSP employees. [*Id.* at 62.] Haines upheld the suspension, finding nothing in her investigation that would change her mind about the discipline. [*Id.*] Jones, after meeting with Plaintiff and reviewing all the pertinent documentation, also agreed with and upheld the suspension. [*Id.* at 64.]

Plaintiff's third performance evaluation occurred in September 2010. [*Id.* at 49–57.] Turner gave her the lowest possible rating in the categories of "teamwork/collaboration" and "positive communication." [*Id*. at 53.] Plaintiff signed the evaluation, indicating she read it and had the opportunity to discuss it with management. [*Id.* at 49.]

Plaintiff's employment was eventually terminated on January 18, 2011 due to incidents that occurred on January 13 and 14, 2011. [*Id.* at 71–72; Doc. 19-5 ¶¶ 6–8.] Plaintiff was scheduled to work on Tuesday, January 11 but did not come in due to snow. [Doc. 19-2 at 53.] Plaintiff was not scheduled to work on Wednesday or Thursday [*id.*], but Cash told her she could come in on Wednesday [*id.*; Doc. 19-3 at 72]. Plaintiff also came in on Thursday, January 13, believing that Cash had told her she could come in to work

that day if her school classes were cancelled. [Doc. 19-2 at 54; Doc. 19-3 at 72.] Because the department was overstaffed on Thursday, Turner asked for volunteers to go home. [Doc. 19-3 at 73; Doc. 19-5 ¶ 6.] No one volunteered, so Turner asked Plaintiff to go home because Plaintiff had not been scheduled to work. [Doc. 19-3 at 73; Doc. 19-5 ¶ 6.] Plaintiff became angry and, before leaving, stated in front of other employees, "I'm tired of this GDMFBS [god damn mother fucking bull shit]." [Doc. 19-3 at 72; Doc. 19-5 ¶ 6.]

On the following day, Friday, January 14, Plaintiff refused to speak with Hudani during the handoff meeting where cases scheduled for the remainder of the day and the next day are reviewed. [Doc. 19-3 at 73–74; Doc. 19-5 ¶ 7.] Turner and Hudani were present at the handoff meeting, and Plaintiff refused to participate. [*Id.*] The Employee Discipline Report indicates that Plaintiff's lack of a team approach and unwillingness to cooperate with co-workers displayed on January 14, and her negative attitude and behavior the previous day, culminated in the decision by Cash and Turner to terminate Plaintiff's employment. [Doc. 19-3 at 71–72; *see* Doc. 19-5 ¶ 8.] The report also indicates Turner

> explained to Christeen that I had hoped she would choose to be a team player. However, there continues to be problems in the department that are mostly directed to her attitude and unwillingness to participate as a team. I explained that this was her choice to continue to behave negatively. And, that unfortunately I would have to let her go. Christeen did not have anything further to say. She left her badge and Vocera and departed peacefully.

[Doc. 19-3 at 72.]

Subsequent to her termination, Plaintiff filed an internal grievance. [*Id.* at 46–47.] In this grievance, Plaintiff made an allegation of race discrimination:

> I feel like because of my race I am being targeted by a co-worker, Naz Hudani, because I do not engage in casual

7

> conversation with her. She consistently falsely reports to
> management that I am negative. I speak to Naz in the morning
> and communicate about the job and nothing further.

[*Id.* at 46.] In her written response to Plaintiff's termination grievance, Cash responded to Plaintiff's allegation of race discrimination by stating that her department "employs individuals from various ethnic groups, including [Hudani] who is from India. . . . There are many medium and high performing employees in the department that are of different races or ethnic origin." [*Id.* at 80.] Cash also maintained that one employee's complaints would not determine if another employee received disciplinary action. [*Id.*] Rather, in Plaintiff's situation, "many different individuals complained." [*Id.*] The grievance was reviewed and Plaintiff's termination upheld by Haines and Jones. [*Id.* at 84, 86.]

## APPLICABLE LAW

**Summary Judgment Standard**

Rule 56 states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows
> that there is no genuine dispute as to any material fact and the
> movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

8

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in her pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, she must produce existence of a factual dispute on every element essential to her action that she bears the burden of adducing at a trial on the merits.

**Title VII and Section 1981**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In 1991, Congress amended Title VII to include that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id*. § 2000e-2(m). Section 1981 broadly prohibits purposeful racially discriminatory conduct which interferes with the terms and conditions of an employment, or other, contract. 42 U.S.C. § 1981; *see Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999); *Theard v. Glaxo, Inc.*, 47 F.3d 676, 697 (4th Cir. 1995). The analysis for determining whether a defendant intentionally interfered with an employment contract under § 1981 is the same as that employed under Title VII. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133, 133 n.7 (4th Cir. 2002); *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

## DISCUSSION

Defendant contends it is entitled to summary judgment because Plaintiff has failed to establish a prima facie case of race discrimination under Title VII or §1981. [Doc. 19-1 at 14.] Specifically, Defendant argues Plaintiff has failed to prove the third and fourth

prongs of a prima facie case—i.e., that she was qualified for the job and performing satisfactorily or that others outside the protected class were retained under similar circumstances. [*Id.* at 15–21.] Further, Defendant contends Plaintiff failed to present any direct evidence of discrimination under Title VII or § 1981. [*Id.* at 14.] Defendant also suggests that, even if Plaintiff could establish a prima facie case, under the *McDonnell-Douglas* burden-shifting scheme, Plaintiff cannot show that the record contains enough evidence to create a genuine issue of material fact both on the issue of pretext and on the ultimate issue of discriminatory intent. [*Id.* at 14, 21–25.]

In response, Plaintiff argues she has satisfied all the prongs to establish a prima facie case of discrimination and that Defendant's proffered reasons for her discharge are untrue or unworthy of credence. [Doc. 21-1 at 4–5.] Plaintiff contends Defendant's reliance on highly subjective criteria in support of her termination can very well support an inference of discrimination, citing *Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012). [*Id.* at 6.] Plaintiff suggests Defendant's references to Plaintiff's poor attitude, ineffective teamwork, and rudeness are factually unsupported and subjective interpretations. [*Id.* at 7.] Thus, Plaintiff argues, "Defendant's proffered explanations are nothing more than vague conclusions subject to arbitrary and capricious enforcement and are unworthy of credence and race was the more likely reason for the dismissal." [*Id.* at 8.]

As the United States Court of Appeals for the Fourth Circuit has explained in the wake of *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), a Title VII plaintiff may "avert summary judgment . . . through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, a plaintiff may survive a motion for

summary judgment "by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor . . . motivated the employer's adverse employment decision." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). The Fourth Circuit defines "direct evidence" as evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor . . . ." *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982) (citing *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir. 1981)). In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds by Desert Palace*, 539 U.S. 90. Circumstantial evidence may "includ[e] but [is] not limited to proof of the claimant's general qualifications, from which the inference of . . . discrimination may rationally be drawn independently of any presumption [of discrimination]." *Cline*, 689 F.2d at 485 (footnote omitted). To demonstrate an unlawful employment practice in these so-called mixed-motive cases, a plaintiff "need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence," that the impermissible factor was a motivating factor, i.e., "direct evidence of discrimination is not required in mixed-motive cases." *Desert Palace*, 539 U.S. at 101–02.

Alternatively, a plaintiff may proceed under the *McDonnell Douglas* "pretext" framework. *Diamond*, 416 F.3d at 318 (quoting *Hill*, 354 F.3d at 285). Under this

framework, an employee must first prove a prima facie case of discrimination.[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff succeeds, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* By providing such an explanation, the employer rebuts the presumption of discrimination created by the prima facie case, and "[t]he presumption, having fulfilled its role of forcing the [employer] to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11 (1993) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). If the employer articulates a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the articulated reason was actually a pretext for retaliation. *McDonnell Douglas*, 411 U.S. at 804.

However, the Fourth Circuit has emphasized that, "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). Further, the court stated,

> To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based

---

[5] To establish a prima facie case of race discrimination in a termination case, the plaintiff must present facts showing that (1) she is a member of a protected class; (2) she was terminated; (3) she was qualified for her job position and her job performance was satisfactory; and (4) other employees outside the protected class were retained under similar circumstances. *Honor v. Booz-Allen & Hamilton, Inc*., 383 F.3d 180, 188 (4th Cir. 2004) (citing *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 133, 133 n.7 (4th Cir. 2002); *Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222, 1228 (4th Cir. 1998)).

upon a protected trait must produce sufficient evidence upon which one could find that "the protected trait . . . actually motivated the employer's decision." *Reeves*, 530 U.S. at 141, 120 S.Ct. 2097 (internal quotation marks omitted). The protected trait "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Id.* (internal quotation marks and alterations omitted); *cf. Price Waterhouse* [*v. Hopkins*], 490 U.S. [228,] 277, 109 S. Ct. 1775 (O'Connor, J., concurring) (noting that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden" of proving discrimination); *Koski v. Standex Int'l Corp.*, 307 F.3d 672, 678 (7th Cir. 2002) (noting that the pertinent inquiry is whether the decisionmaker, as opposed to other managers or subordinates, evaluated the aggrieved employee based upon discriminatory criteria).

*Id.* Thus, whether a plaintiff proceeds under the first or second avenue of proof, the plaintiff's ultimate burden is to demonstrate the employer's adverse employment action was motivated, at least in part, by discrimination.

In this case, Plaintiff relies on the *McDonnell Douglas* burden-shifting scheme[6] to establish her case of discrimination, contending that she can establish a prima facie case of discrimination and that Defendant's articulated legitimate, nondiscriminatory reason for

---

[6]One court within the Fourth Circuit has noted, "[t]he relevance of the *McDonnell Douglas* scheme outside of the trial context is limited." *Lerner v. Shinseki*, No. ELH-10-1109, 2011 WL 2414967, at *14 (D. Md. June 10, 2011). The Fourth Circuit has observed:

> Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of "the ultimate question of discrimination vel non." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983). As the Supreme Court has explained, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Thus, "[c]ourts must . . . resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination vel non.'" *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (citation omitted).

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294–95 (4th Cir. 2010) (alteration in original).

her termination is a pretext for discrimination. [Doc. 21-1 at 4–9.] The Court, however, concludes Plaintiff has failed to present facts that support a prima facie case of discrimination and, therefore, has failed to establish a claim of race discrimination.

First, while Plaintiff is unquestionably qualified for her job position as a CSP technician, she has failed to present facts that would establish that her job performance was satisfactory or that she was meeting her employer's legitimate expectations.[7] As Cash averred, all of Defendant's employees are expected to follow the Studer Management Philosophy by focusing not only on their job skills and efficiencies but also on how they treat other employees and patients in carrying out their responsibilities. [Doc. 19-4 ¶ 2.] While Plaintiff was a skilled surgical technician, her attitude and disruptive behavior impeded her ability to meet Defendant's expectations with respect to her relationship with fellow employees and patients. [*Id.* ¶¶ 3, 11; Doc. 19-5 ¶ 5.] Defendant acknowledges Plaintiff's attempts to improve; however, complaints regarding her attitude and behavior persisted. [*See, e.g.*, Doc. 19-3 at 22 (noting Plaintiff knew she needed to work on her relationships with co-workers and was trying to improve those relationships), 24 (acknowledging her temper as a weakness), 25, 27–28, 31–32, 34, 36, 38, 40, 59–60 (complaints or acknowledging complaints).]

Second, Plaintiff has failed to establish that other employees outside the protected class were treated more favorably under similar circumstances. While Plaintiff argues other employees outside the protected class violated other policies without ramification—such as falling asleep, breaking a scope, smoking, drinking, stealing, and

---

[7] Plaintiff has established the first two elements of a prima facie case—she is a member of a protected class and she was terminated. *See Honor*, 383 F.3d at 188.

15

using foul language[8] [Doc. 21-1 at 3]—she has failed to identify any employee who committed similar conduct and received more favorable treatment than Plaintiff. On the other hand, Defendant has submitted evidence that similarly situated employees outside the protected class were treated the same as Plaintiff. For example, Cash averred she terminated a white female on May 4, 2010 because that "consistently continues to display unprofessional behavior and attitudes that disrupt the operating room." [Doc. 19-4 ¶ 12 & at 8.] Three weeks after Plaintiff's termination, Ms. Cash terminated another white female for inappropriate and unprofessional behavior including disrespectful and insubordinate language used to her supervisor. [*Id.* ¶ 13 & at 10.] The evidence in the record clearly suggests Defendant, through Cash, was consistent in the discipline of employees who exhibited poor attitude and disruptive behavior contrary to the Studer Management Philosophy in the Perioperative Department, regardless of race.

Plaintiff argues Defendant's reasons for questioning her job performance and for her termination are highly subjective and subject to scrutiny, relying on two cases outside the Fourth Circuit to support her position: *Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012) and *McKinley v. Skyline Chili, Inc.*, No. 1:11–CV–344, 2012 WL 3527222 (S.D. Ohio Aug. 14, 2012). [Doc. 21-1 at 5–8.] However, these cases do not support Plaintiff's ultimate position that Defendant's proffered explanation is unworthy of credence.

For instance, in *Hamilton*, where the plaintiff proceeded under mixed-motive theory and not under the *McDonnell Douglas* framework in a failure to hire case, the court found the defendant's reasons for failing to hire the plaintiff were suspect because the plaintiff

---

[8] Plaintiff offers no evidence of when these events occurred or whether Cash or Turner were aware of these events.

was unquestionably more qualified than the person hired and the job description did not require or emphasize the qualities or skills the plaintiff was apparently found to lack. 666 F.3d at 1356–57. Further, the court concluded the subjective nature of the proffered nondiscriminatory explanation—the plaintiff's lack of enthusiasm, poor interview performance, and poor communication skills—were not noted in any contemporaneous documentation supporting the hiring decision and could lead a reasonably jury to disbelieve the defendant and reach a verdict in the plaintiff's favor. [*Id.* at 1357.] Here, in contrast, Defendant had a clear policy emphasizing an employee's role in creating a positive work environment and an employee's duty to work well with co-employees, which translate directly to quality of care and patient experience. [Doc. 19-4 ¶ 2.] Additionally, the record contains contemporaneous documentation evidencing Plaintiff's inability to comply with this policy. [*See, e.g.*, Doc. 19-3.] Thus, while the reasons for Plaintiff's termination may be subjective, unlike in *Hamilton*, they were based on a clear written policy and contemporaneously documented.[9]

Plaintiff has provided no evidence to suggest the expectations of Defendant were not legitimate.[10] As the Fourth Circuit has clarified, it is the perception of the decision

---

[9]The Court has also considered *McKinley* and found that case likewise fails to bolster Plaintiff's position. In *McKinley*, the court held "[t]he standard for 'qualified' in the context of employment discrimination should not be based on the subjective and arbitrary reasoning of the defendant employer because that can too easily mask discrimination." 2012 WL 3527222, at *4. Here, there is no dispute as to whether Plaintiff was qualified for her position. Rather, the parties dispute whether Plaintiff's job performance was satisfactory, the second part of the third prong required to establish a prima facie case of discrimination in the context of termination in the Fourth Circuit. *See Honor*, 383 F.3d at 188.

[10]As recently summarized by another court in this District,

> An employer's expectations of its employees are "legitimate" when they are honestly held; whether the employee agrees with those expectations is not the test. In this context, the term "legitimate" means that expectations cannot be a "sham designed to hide the employer's

maker—not the self-assessment of the plaintiff—that is relevant in determining satisfactory job performance. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Nor does the record reveal that, in similar circumstances, employees outside Plaintiff's protected class were treated more favorably than Plaintiff. Further, the record failed to reveal any other circumstances permitting an inference of race discrimination. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 851 n.2 (4th Cir. 2001) ("What is critical with respect to the fourth element is that the plaintiff demonstrate he was not hired (or fired or not promoted, etc.) 'under circumstances which give rise to an inference of unlawful discrimination.'" (quoting *Burdine*, 450 U.S. at 253)). Thus, Plaintiff has failed to establish prongs three and four of the prima facie case, and Defendant's motion for summary judgment should be granted on Plaintiff's Title VII and § 1981 claims.

## **RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that Defendant's motion for summary judgment be GRANTED.

IT IS SO RECOMMENDED.

*[signature]*

Jacquelyn D Austin
United States Magistrate Judge

October 31, 2012
Greenville, SC

---

discriminatory purpose." As long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers.

*Thompson v. Harvest Hope Food Bank*, No. 3:10-2003-MBS-PJG, 2012 WL 591672 (D.S.C. Jan. 17, 2012) (citations omitted), *report and recommendation adopted by* 2012 WL 590812 (D.S.C. Feb. 23, 2012).